ELIZABETH WELCH *v.* ALEXANDER H. STOWELL, JOHN V. RUEHLE, AND HENRY MYERS.

The statute, (S. L. 1832, p. 40. § 3,) empowering the common council of the city of Detroit "to make all such by-laws and ordinances as may be deemed expedient for the purpose of preventing and suppressing houses of ill fame within the limits of the city," does not authorize the common council, by ordinance and resolution, to require the city marshal to demolish a house occupied as a house of ill fame, and adjudged by such council to be a common nuisance.

Neither have individuals the right to abate the nuisance occasoned by the occupation of a building as a house of ill fame, by demolishing the building.

It seems that the power to abate a nuisance is limited to the removal of that in which the nuisance consists.

Indictment of the offenders is the appropriate remedy, both at common law and under the statute, for the suppression of houses of ill fame.

CASE reserved from the Wayne Circuit Court. This was an action of trespass for demolishing a dwelling house in the city of Detroit, owned and occupied by the plaintiff, Elizabeth Welch. At the trial in the circuit court, the jury returned a special verdict, by which they found that the trespass had been committed by the defendants as alleged in the declaration; but that, at the time, the house was, and for more than ten years previously had been, occupied by the plaintiff as a house of ill fame, and that it was a common nuisance. They further found that, on the 16th of September, 1836, and before the trespass alleged, the common council of the city of Detroit passed an ordinance, to the effect that, when any house or building within the limits of the city, occupied or kept as a house of ill fame, should be deemed by the common council to be a common nuisance, it should be competent for such common council to abate such nuisance by ordering such house or other building to be pulled down and re-

moved, at the expense of the owner, proprietor, or occupant thereof, at the discretion of the common council. That afterwards the said common council, by resolution duly adopted, ordered, adjudged, and declared the dwelling house of the plaintiff, described in the declaration, to be such common nuisance, and empowered and directed the city marshal to proceed with sufficient force and apparatus, to demolish the same : And that the alleged trespass was committed by the defendants, while acting in obedience to this resolution,—Stowell being, at the time, marshal, and Ruehle one of the aldermen of the city, and Myers assisting at the request of Stowell.

The question of whether, upon the facts thus found, the defendants were justified in pulling down the house of the plaintiff, was reserved by the Presiding Judge for the opinion of this court.

*George C. Bates* and *C. Tryon*, for the plaintiff,

*D. E. Harbaugh*, City Attorney, and *A. D. Fraser*, for defendants.

WHIPPLE, J. delivered the opinion of the Court.

The third section of " An act to amend ' an act entitled an act relative to the city of Detroit,' " approved June 29, 1832, (S. L. 1832, p. 40,) confers upon the common council of the city, " full power and authority to make all such by laws and ordinances, as may by the said common council, be deemed expedient, for effectually preventing and suppressing all disorderly houses, and houses of ill fame, within the limits of said city."

Under this grant of power, the common council, on the 16th September, 1836, adopted an ordinance entitled "an ordinance to suppress disorderly houses and houses of ill fame."

The first section of this ordinance provides, that " any

person or persons who shall, within the limits of the city of Detroit, keep a disorderly or ill governed house or place, or a house for the resort of persons of evil name or fame, &c., shall, on conviction thereof before the Mayor's Court of said city, be punished by fine and imprisonment or either, at the discretion of the court," &c.

The second ·section provides that, "when any such house or building, so occupied, shall be deemed by the common council to be a common nuisance, it shall be competent for said common council to abate such nuisance by ordering such house or other building to be pulled down and removed, at the expense of the owner, proprietor or occupant thereof, at the discretion of such common council."

In the case of *Slaughter* v. *The People*,* these provis-

---

* Following is a report of the case here cited, which was decided at the January Term, 1842, of the Supreme Court—Present: WM. A. FLETCHER, C. J., and MORELL, WHIPPLE and RANSOM, Justices.

### JAMES SLAUGHTER v. THE PEOPLE.

Keeping a house of ill fame, is a *criminal offence* within the meaning of Article I, § 11, of the constitution of the state, which declares that "no person shall be held to answer for a criminal offence, unless on presentment of a grand jury; except," &c.

*Held,* accordingly, that an ordinance of the common council of Detroit, prescribing the punishment for keeping a house of ill fame within the limits of the city, and providing for the trial and conviction of offenders by the mayor's court, where the proceedings are by complaint, *without presentment of a grand jury,* was unconstitutional; and that a summary conviction, by the mayor's court, for a violation of this ordinance, was void.

CERTIORARI to the Mayor's Court of the city of Detroit. Summary proceedings by complaint, without indictment, having been instituted against James Slaughter, in the mayor's court, for keeping a house of ill fame, within the limits of the city, in violation of an ordinance of the common council of the city, he was tried and convicted by that court, and sentenced to pay a fine of one hundred dollars. To· reverse this judgment, Slaughter sued out this writ of *certiorari.*

C. *Tryon* and *Geo. C. Bates*, for the plaintiff in error.

D. E. *Harbaugh*, City Attorney, and A. D. *Fraser*, for the People.

WHIPPLE, J., delivered the opinion of the Court. It is insisted, as a ground for reversing the judgment of the mayor's court, that the offence of keeping a house of ill fame, is, both by common law and the statute of this state, a *criminal offence*;

ions of the act of the legislature, and of the ordinances of the city, were fully considered by this court; and we then determined that the summary conviction of the plaintiff, under the first section of the ordinance, was void, as being repugnant to that provision of the constitution which declares that "no person shall be held to answer for a *criminal offence,* unless on the presentment or indictment of a grand jury, except," &c. The question now arises whether, under the general grant of power contained in the act of 29th June, 1832, and the facts in this case, the defendants were justified in pulling down the house of the plaintiff. In order to determine this question, we must examine into the validity of the second section of the ordinance above referred to. It is undeniable, that the act referred to has invested the common council with large

and, inasmuch as the party was tried without the intervention of a grand jury, the proceedings are irregular and void.

With respect to the first branch of the proposition, there can be no doubt. "All disorderly inns or alehouses, bawdy houses, &c. are public nuisances, and may, therefore, be indicted." 1 Russ. on Crimes, 297. Again: "Every person who shall keep a house of ill fame, resorted to for the purpose of prostitution or lewdness, shall be punished by imprisonment in the county jail not more than one year, or by fine not exceeding three hundred dollars." R. S. 1838, p. 647. Whether, therefore, we consult the common law, or the statute of this state, it is clear that keeping a bawdy house, or house of ill fame, is an offence, punishable by fine or imprisonment in the discretion of the court.

The determination of the second branch of the proposition must depend upon the construction of Article I, section 11, of the constitution of this state, which provides that, "No person shall be held to answer for a *criminal offence,* unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases cognizable by justices of the peace, or arising in the army or militia when in actual service, in time of war or public danger." What, then, is a "*criminal offence,*" within the true intent and meaning of the constitution? To determine this question, we must necessarily define the term, "criminal offence." "A crime or misdemeanor," says Blackstone, "is an act committed, or omitted, in violation of a public law, either forbidding or commanding it." 4 Bl. Com. 5. It will be perceived that this definition is applicable both to crimes and misdemeanors, which, says the same eminent author, "properly speaking, are mere synonymous terms; though, in common usage, the word '*crimes*' is made to denote such offences as are of a deeper and more atrocious dye; while smaller faults and omissions of less conseqence, are comprised under the gentler name of 'misdemeanors' only." We must, then, consider the term "*criminal offence,*" in its strict legal and technical sense, as including both crimes and misdemeanors, unless it is manifest that the framers of the constitution intended to limit or restrain the meaning of that term, as it was then and is now under-

discretionary powers; but it is our duty to ascertain the intention of the legislature, and to give effect to such intention, provided we can do so, without violating those wise and salutary rules by which courts are guided in the construction of statutes. Is it, then, fair to presume that the legislature ever contemplated conferring upon the common council the authority to demolish a house to which persons of evil name may resort? It is a sound rule in the construction of statutes, that general words may be restrained or enlarged, so as to effectuate the intention of the law-maker; so, where a general authority to legislate over a subject is conferred by the sovereign power upon a subordinate political corporation, it is always presumed that their legislation will conform, as far as practicable, to the legislation of the state, on the same subject matter;

stood and expounded by authors of the highest repute; for it is readily conceded that general terms in a constitution or statute may be restrained in their meaning or application, provided violence is not done to any of those fundamental rules by which courts are guided in the construction of laws; and especially is this true, where effect is given to the obvious intention of the law-maker. It is contended by the counsel for the defendants in error, that the term "criminal offence," in our constitution, is synonymous with the term "capital or other infamous crime," in the corresponding provision of the constitution of the United States; and that the words, "infamous crimes," are intended to denote "such offences as are of a deeper and more atrocious dye;" or, in other words, that class of offences denominated at the common law, "*felonies.*" Upon a full and deliberate examination of this part of the case, I have come to the conclusion, that to restrain and limit the general language used in the constitution, in the manner thus contended for, would violate both the letter and the spirit of the provision now under consideration.

I shall now briefly state some of the most prominent and obvious reasons by which my mind has been led to this result. And first: It is a fair presumption that the framers of our constitution, in adopting legal terms, had reference to their strict legal and technical import. To suppose otherwise, would argue a degree of carelessness in the use of language, which would be inexcusable in an ordinary legislative body, but especially so in a body engaged in framing a permanent constitution and form of government. Secondly: It is quite probable that the Convention, in adopting the provision in question, consulted the corresponding provision in the constitution of the United States, which is eminently distinguished, not merely for the principles it embodies, but for the precision and clearness with which those principles are stated. To my mind the difference in the phraseology was intentional, and not merely accidental. Thirdly: Not only does our constitution differ from the constitution of the United States, in this respect, but very essentially from the constitutions of almost every state in the Union. Fourthly: In the most modern of the constitutions of the states of the Union, there is a manifest inclination, not merely to enlarge, but to guard with great strictness

that no new or extraordinary remedies for suppressing an evil,—remedies unknown to the legislation of the state or to the common law,—can be provided, unless the authority to provide such remedies is given in express terms. Again : ordinances and by-laws must be reasonable ; and their reasonableness is, in general, to be tested by the intention of the authority granting the charter, and the good of the corporation erected by the charter.   With these rules and principles in view, can it be supposed that the legislature intended by a general grant of power to make all such by-laws and ordinances as might be deemed proper and necessary to suppress houses of ill fame, to authorize the common council to adopt the remedy provided for in the ordinance under consideration?   A bawdy house is a public nuisance, both at the common law and under our stat-

the liberties of the citizen.   Fifthly, The ancient rule with respect to the distinction between felonies and misdemeanors, has given place to another more enlightened and just.   And Sixthly, In view of the rule as it now exists, the same reasons which are urged in support of the principal that no man shall be called upon to answer for a *felony*, unless he be first indicted by a grand jury, apply with equal force to cases where an individual is charged with an offence known at common law as a misdemeanor. If my reasoning be right, then, it follows, that the term "criminal offence" used in the constitution, is to be taken in its most comprehensive sense, as including both felonies and misdemeanors.

The next question to be determined is, whether in this case, the provision of the constitution referred to, has been violated.   The return to the writ of certiorari shows that the incipient proceeding before the mayors' court was a complaint, charging the plaintiff in error with the commission of an offence against the ordinances of the City; that upon the complaint the defendant below was tried, found guilty, and sentenced to pay a fine of fifty cents. If the views I have expressed be correct, it follows that this proceeding in the mayors' court, against the plaintiff in error, was void, as being against that provision of the constitution. which declares, that "No person shall be held to answer for any criminal offence, unless on the presentment or indictment of a grand jury."   I have not been unmindful of the views taken of the present case by the counsel for the city upon the argument, or of the numerous points made in the brief with which I have been furnished to sustain the proceedings below.   If I have not noticed them particularly, the reason will be found in the fact, that I have deemed them as inapplicable to the *real* question presented for the consideration of this court.   Before, however, dismissing this part of the case, I desire, very briefly to comment upon one point made by the counsel in argument, and relied upon in his brief. It is said that, the legislature, by an act passed June 9, 1832, invested the common council of the city with full power to make by-laws and ordinances, "for effectually preventing and suppressing all disorderly houses and houses of ill fame, within the limits of said city."   (S. L. 1832, p. 40 § 3.) That in pursuance of the power thus

ute; the penalty for maintaining such a nuisance is fine and imprisonment; *this* is the mode provided for their suppression by the general law of the state, and the common law.   The mode, then, provided by the ordinance for suppressing the evil, it is obvious, is both novel and extraordinary.   By the common and statute law, *fine and imprisonment* are considered adequate for the suppression of the evil: by the *ordinance*, a new and unusual remedy for the mischief is provided.   The law of necessity alone, it appears to me, could justify the common council in resorting to the destruction of property to suppress houses of prostitution.   In providing remedies for existing evils, the legislative authority usually adopt the means adapted to the end sought to be accomplished.   It is, I think, manifest, that the penalties inflicted in such cases, are abund-

granted, the ordinance under which the defendant below was convicted was adopted on the 16th September 1836, and provides that if "any person or persons, shall, within the limits of the city of Detroit, keep a disorderly or ill governed house, or place, or a house or place for the resort of persons of evil name and fame or of dishonest conversation," &c., such person or persons "shall be punished by fine and imprisonment, or either, at the discretion of the court."   The second section provides "that when any such house or building, so occupied or kept as aforesaid, shall be deemed by the common council to be a common nuisance, it shall be competent to said common council to abate such nuisance." &c.   It is further said that the act of the legislature conferring the power, was passed previous to the adoption of the constitution, and inasmuch as the legislature of the state did, in the Revised Statutes which took effect on the 31st August, 1838, ratify and confirm the charter of the city, this ratification is to be regarded as an expression of the legislature in favor of the constitutionality of the act of 1832, and as such, entitled to great weight.   A legislative construction of the constitution is entitled to, and should always be treated with the highest respect, by a co-ordinate department of the government; but such expression of opinion is by no means conclusive or binding, and this court will never *hesitate to* pronounce any law void, where it manifestly violates the constitution.   But it is unnecessary for us to pronounce the act of 1832, unconstitutional.   I do not, myself, perceive that it is so. It is the "ordinance" under which the plaintiff in error was convicted that I think unconstitutional.   I go farther, and suggest a doubt, whether, under the act of 1832, the common council possessed the *power* of passing the first section of the ordinance under which the proceedings in the case were had.   The power to prevent and suppress houses of ill fame, does not necessarily invest the common council with power to pass a law which makes it a criminal offence for any person to keep such a house, and impose a penalty of fine and imprisonment, *without any limitation as to the amount of the fine, or the term of the imprisonment.*   To confer upon a municipal corporation powers so vast as those asserted in the ordinance—powers by which a court, proceeding in a *summary way,* may incarcerate a citizen, for a day or a year,

Welch *v.* Stowell—Slaughter *v.* People.

antly sufficient to cure the evil, without a destruction of the building in which the victims of prostitution reside. The law, by acting on the individuals themselves by the imposition of fines and incarceration in jails and penitentiaries, can better eradicate the evil, than by resorting to *the extraord*inary remedy provided for in the ordinance. It must, indeed, be an éxtreme case, that will authorize the municipal authorities of the city to doom a house to destruction by a simple resolution declaring it a house of ill fame. The expediency of such an exercise of power might well be questioned, though authorized by the supreme authority of the state, even if the fact is first to be *judicially* ascertained, that the inmates of a house are prostitutes. If so, it would require a very strong and clear expression of the legislative will, before affirming that such power *is granted to a corporation*, whose sentence of condemnation, in respect to the fact, is not based upon the verdict of a jury, but a simple resolution of the common council. It is apprehended, therefore, that the

or five years, and impose a pecuniary penalty of one dollar, or one thousand dollars, *at its discretion,*—appears to me to be repugnant to all the notions which we have formed of the nature of the institutions under which we live. I cannot believe for a moment, that the act of 1832 will warrant an exercise of power which might be wielded for purposes of oppression. No instance can be found in our laws where a *dis-cretion* so broad has been conferred, even upon our higher judicial tribunals, where the proceedings are had according to the course of the common law; and surely it could not have been intended to clothe an inferior jurisdiction with a *discretion so dangerous and unusual.*

It was asserted with some emphasis by the counsel for the city, that the determination of this case, by the court, would determine in effect the powers of the common council, and the mayors' court, in respect to its police regulations. I disclaim the expression of *any opinion respecting any law or ordinance except those whose validity is* necessarily involved in the case at bar; and I shall at all times be ready to sustain the proceedings both of the common council, and the mayors court, when they act within the scope of the authority conferred upon them. That the former should be invested with *all necessary and usual* powers to carry into effect the object for which the corporation was created, and that tribunals should be erected to enforce those powers by a summary proceeding, is very readily granted. The legislature have performed their duty by a grant of power sufficiently broad to authorize the enforcement of the most rigid police; it is for the local authorities to see that the grant thus liberally made is not abused.

*Judgment reversed.*

authority claimed for the common council, never was intended to be granted.    The legislature must be presumed to have been aware that to keep a bawdy house, was a *"criminal offence,"* within the meaning of Article I, section 11, of the constitution of this state ; and it is scarcely credible that a power so vast as that claimed, *and to be* executed in a mode so unusual, could have been granted. We think the act of the legislature should receive a more reasonable construction—a construction more consistent with all our notions of right and justice,—a construction which will protect, as well the public, against the evil complained of, as the rights of property, which should be held sacred.    The whole course of proceeding marked out by the second section of the ordinance is altogether too summary and extraordinary to receive the sanction of any judicial tribunal familiar with those guards by which the rights of persons and property in this country are secured. All that would be required of the common council would be the adoption, without judicial investigation, of a resolution that a house is inhabited by persons of ill fame, and then, of an order directing its demolition.    This summary proceeding, it appears to me, would be an attempt in too many instances, to correct public morals, at too great a sacrifice of right and justice.    If the common council may *make* such an order in respect to the worthless house inhabited by the plaintiff, they may make a like one to be executed upon the most costly edifice in the city, provided it should, without even the knowledge of the owner, be the abode of the vicious and profligate.    Such a proceeding no community would tolerate.    The public health and morals of large towns and cities demand the enforcement of a rigid police, and the authorities should be armed with all the necessary powers for the protection of both.    All the powers necessary for these purposes, have been granted to the city of Detroit ; to this grant of

power the plaintiff makes no complaint, but objects to the mode and manner of its execution. I think, her complaint is well founded, and that the second section of the ordinance in question is nugatory and void.

But it is said that, irrespective of this provision of the ordinance, the defendants are justified, upon the ground that the house in question was a common nuisance, and that the corporation of the city, or the defendants as individuals, might abate it. The law undoubtedly authorizes the corporation of Detroit, or any person residing within its limits, to abate any nuisance that may exist. This right is one of the few exceptions to the general rule that no man shall take the law into his own hands; the exception finds its vindication in the law of necessity. It is a right, however, to be exercised with caution. Care must be taken that nothing is done but what is absolutely necessary to abate the nuisance. Let us apply the rule contended for by the defendants, to the present case. It is said that the house was a nuisance. This may be very true; but it was a nuisance in consequence of its being the resort of persons of ill fame. That which constitutes or causes the nuisance may be removed: thus, if a house is used for the purpose of a trade or business, by which the health of the public is endangered, the nuisance may be abated, by removing whatsoever may be necessary to prevent the exercise of such trade or business: so a house in which gaming is carried on, to the injury of the public morals; the individual by whom it is occupied may be punished by indictment, and the implements of gaming removed; and a house in which indecent and obscene pictures are exhibited is a nuisance, which may be abated by the removal of the pictures. Thousands of young men are lured to our public theatres, in consequence of their being the resort, nightly, of the profligate and abandoned; this is a nuisance. Yet in this, and in the other

cases stated, it will not be contended that a person would be justified in demolishing the house, for the obvious reason that to suppress the nuisance such an act was unnecessary. So in the case before us, the nuisance was not caused by the erection itself, but by the persons who resorted there for the purpose of prostitution. Our laws have provided a mode by which the cause may be removed; the person who owned or occupied the house, might have been indicted, as well as the persons who resorted there for the purposes of prostitution; and, upon conviction, they would have become the tenants of our jails or penitentiary. This would have been striking at the root of the evil; but surely the destruction of the house did not abate the nuisance. The cause still remained; its inmates would resort to other receptacles of vice; and in no respect would the public morals be promoted. In this, and the like cases, the only remedy for the mischief is to apply the stringent provisions of our criminal law, and thus place its authors where their evil example will no longer offend public decency, or destroy public morals. The rule I have stated in respect to the abatement of a common nuisance, is sustained by cases to be found in Strange, 688; *Cooper* v. *Marshall*, 1 Burr. 267; 7 T. R. 467; 1 Russ on Crimes, 306.

In the argument of the case, the counsel for defendants relied, with much confidence, on the case of *Meeker* v. *Van Rensaeller*, 15 Wend. 397, as supporting the principle contended for by them, that the city authorities had a right to direct the building to be pulled down. I have examined that case with much care, and find the views I have expressed in this opinion strongly confirmed. The facts in the case were, that a building, originally erected as a *tan house* was divided into several apartments, and while the *Asiatic cholera* prevailed in Albany in 1832 these apartments were inhabited by a large number of

emigrants from Ireland. " *The premises were extremely filthy* ;" and under the floors were 20 *tan vats*, most of which were filled with putrid stagnant water, which oozed through the floor on walking over them. The building having been pulled down, an action was brought by the owner. Upon the trial of the case the court charged the jury that " if they should find that the building torn down was a nuisance, and that the defendant resided in the neighborhood, and had done no more than was necessary to abate it, they ought to find a verdict in his favor ; but if they should find that the *building* was not a nuisance, then the defendant was liable to damages." Upon reviewing the case in the supreme court, Chief Justice *Savage*, remarked that " it was not denied upon the trial that the *building* torn down was a common nuisance, nor was it upon the argument ;" and again, that " the proof in the case, from the plaintiff's own witness, was, that there was no other way to come at the evil but by pulling down the building." From the facts in the case, the charge of the court upon the trial, and the subsequent decision of the supreme court, it is quite clear that two facts were either admitted or proved : first, that the building was a common nuisance ; and secondly, that it could have been abated in no other way than by its destruction. If these facts were established in the present case, our judgment would be for the defendants. If it had appeared in *Meeker* v *Van Rensaeller* that the building which the emigrants inhabited was cleanly, but that it became dangerous while the cholera prevailed in Albany, in consequence of its being thronged with the emigrants, it is very clear that the determination of the court would have been different. Upon such a state of facts the plaintiff must have recovered, for the reason that the nuisance might have been abated by the removal of the occupants, and that the destruction of the building was unnecessary.

Upon the whole, we are all of opinion that the law arising upon the facts before us, is with the plaintiff.

*Ordered certified accordingly.*